CANNON (LOCKE v.). See Case No. 8.440.

CANNON (McNEIL v.). See Case No. 8,913.

CANNON (PEOPLE v.). See Case No. 10,-967.

---

## Case No. 2,386.

CANNON v. The POTOMAC.

[3 Woods, 158.] [1]

Circuit Court, D. Louisiana. April Term, 1878. [2]

COLLISION—DIVISION OF DAMAGES—DEMURRAGE—APPLICATION OF INSURANCE MONEYS.

1. A collision took place between two steamboats caused by the fault of both. but the fault of one was greater than that of the other. Held. that the court could not gauge the demerit of the boats in assessing the damage to be borne by each. If both were in fault. though in different degrees, the damage should be equally divided between them.

2. Demurrage forms a fair subject for the allowance of damage in collision cases. [See The Baltic, Case No. 824.] [See note at end of case.]

3. Two steamboats had collided with each other by the fault of both, and were adjudged to pay each one-half the damage. One of the boats received insurance money to cover part of her damage. Held, that it was not to be deducted from the share which the other steamer was adjudged to pay, even though the underwriters had voluntarily released her from all claim for her fault in causing the collision.

[3] [Reported by Hon. William Cranch, Chief Judge.]

[1] [Reported by Hon. William B. Woods. Circuit Judge, and here reprinted by permission.]

[2] [Reversed in part. and affirmed in part, in The Potomac v. Cannon, 105 U. S. 630.]

4. In such case, the owners of the insured boat were allowed to apply their insurance money to that portion of their loss 'for which they had no redress against the other boat.

[See note at end of case.]

On appeal from the district court of the United States for the district of Louisiana.

Admiralty appeal. The libel was brought by [John W. Cannon] the owner of the steamboat [Robert E.] Lee against the steamboat Potomac [James A. Batchelor and others, claimants], to recover damages for a collision which took place between the two boats on the Mississippi river, about one mile above Natchez, on the morning of December 21, 1870. Both boats were damaged by the collision, but the injury sustained by the Lee was much the greater.

[The district court found that both vessels were in fault, and, in assessing the damages, decreed that the amount paid by the insurance companies to libellant should be deducted from libellant's damages; and, from this decree, libellant appealed.]

[The Robert E. Lee was insured on two-thirds of the valuation, by valued policies, by which, in case the insurers should pay any loss, the assured agreed to assign to them all right to recover satisfaction from any other person, or to prosecute therefor at the charge and for the account of the insurers, if requested, and that they should be entitled to such proportion of the damages recovered as the amount insured bore to the valuation in the policies. The insurers paid the libellant two-thirds of the damage, and released and assigned to the owners of the Potomac all their right in any damages growing out of the collision.][3]

B. Egan, for libellant.
J. Ad. Rosier, for claimant.

BRADLEY, Circuit Justice. If I were to believe the evidence of the officers of the two boats which came into collision in this case, I should be forced to the conviction that a collision was utterly impossible. They show most clearly, on the one side and the other, that both vessels had come to an entire standstill, if they were not, in fact, backing, before they met. That both vessels gave signals when they were 800 yards apart, but neither heard that of the other, which I can only account for on the supposition that they were given at the same instant of time. The flat contradictions which we are obliged to encounter in cases of this sort are a melancholy evidence of the effect of self-interest on the memories, if not on the consciences, of men. Some facts, however, seem to be indisputable. Both sides agree that a collision did in fact occur, and that serious damage was inflicted on both vessels. They concur also in the fact that the collision occurred nearer to the Mississippi than to the

[3] [The above additional facts were taken from The Potomac v. Cannon, 105 U. S. 630.]

Louisiana shore, and at no great distance from the former—as near, in fact, as was safe for large steamers to run at that stage of the water—and to the east of the center line of the channel. They concur in the fact that the two vessels did not meet head on, but at an angle of at least forty-five degrees, if not greater than that, the starboard of the Potomac being presented to the larboard of the Lee, in such a manner that the stern of the former was driven almost squarely into the bow of the latter, penetrating to her kelson. A very slight difference in their positions, that is, if the Lee had been a few feet to the larboard of her position, or if the Potomac had been a few feet to the larboard of hers, without any change in their relative angle of direction, the thing would have been reversed, and the Lee would have penetrated the bow of the Potomac in exactly the same manner as the Potomac did that of the Lee. Which of them should be the penetrating vessel was a sheer matter of accident. There is nothing in that circumstance which throws the least light upon the question where the fault lay. That there was fault somewhere must be conceded. Two such manageable boats as these were, could not have come together with so much water-way as they had, and in such a clear and quiet night, without some carelessness or inattention on one side or other, or on both sides. I have stated that it is a conceded fact that the vessels came together at an angle of at least forty-five degrees. The weight of evidence is, that they even struck more squarely than that; that is, that at the time of collision, they were crossing each other's course more directly and squarely than at an angle of forty-five degrees. The officers on each side, respectively, endeavor to throw the blame of this upon the other side. The officers of the Lee say that she was heading straight up the river, and that the Potomac, being further out in the channel, as she approached the Lee, turned around to the larboard, as if she were rounding to at a landing, and struck the Lee nearly squarely upon her bow. On the other hand, the officers of the Potomac say that she was heading straight down the river, following the bend of the Mississippi shore, and that the Lee, being on the Louisiana side of the channel, in the vicinity of the bar there, turned to the starboard and attempted to cross to the Mississippi side, in front of the Potomac, and athwart the course she was properly pursuing. Either of these statements would account for the angle at which the vessels came together; but they are directly opposed as to which vessel was following the line of the channel, and which was crossing it. The angle at which they met we are certain about, but the course of the respective vessels at the moment of meeting, relative to the line of the channel, is disputed by directly contrary averments on each side.

There is a third hypothesis which would bring the vessels together at the angle at which they struck, and which would not require that either of them should have crossed the channel, namely, by supposing that both vessels were pursuing the general line of the channel, on the Mississippi side of it, and approaching each other nearly head on (which, if both are to be believed with regard to their own vessels respectively, must have been the case), and that just before meeting, both vessels, in order to pass each other, turned in the same direction, towards the Mississippi shore, the Lee to her right, and the Potomac to her left, as two men sometimes do on the side-walk, and thus come together. This manoeuvre would cause them to meet at the angle they did, and would be in harmony with all the absolutely certain facts of the case. It would square with the assertion so positively made on both sides, that they were on the Mississippi side of the river, and that they were following the general course of the channel. It would also accord with the facts asserted on each side respectively; by the pilot of the Lee, that he intended to pass the Potomac on the right, and by the pilot of the Potomac, that he intended to pass the Lee on the left. They both say that they signaled respectively to that effect. Is it not possible that as they approached each other, and found that they were in close proximity, each urged his helm in the direction of his thoughts, on the supposition that the other was apprised of his intention, and would pursue the same idea? This supposition would produce exactly the results which actually happened, and would relieve the parties from the imputation of a great deal of gratuitous swearing. To appearance it would be true, that the approaching vessel would seem to be attempting to cross the track of that on which the observer stood. I am disposed to think that this is the true solution of the relative movements of the vessels, and of a great deal of the apparent contradiction in the testimony. The question then arises, which party was to blame for not avoiding this collision? It certainly need never to have occurred if proper diligence had been observed on both sides. Where is the want of diligence to be found? By the rules of navigation on the Mississippi river, it was the duty of each party to signal the other as to the side on which he would pass. It was the duty of the Lee, as the ascending steamer, to do this first, and if she met with no response from the other steamer when they were within eight hundred yards or half a mile of each other, to stop and back until she could succeed in getting some response. The officers of the Lee say that such signal was given by them, viz., one whistle, indicating their intention to pass on the starboard side, and that they did not get any responsive signal from the Potomac; hence it was clearly their duty to proceed no further, but stop and back and wait. On the other hand, the descending boat, the Potomac, had a right to control the mode of passing by signaling her intention; and her officers say that she did give the signal of two whistles, indicating her intention to pass on the larboard side, but that they heard no signal from the Lee. Then it was their duty, when within eight hundred yards of the Lee, to stop and back until a communication could be exchanged. This they say they did. Now, if the statements on both sides be true, it is impossible that a collision could have occurred. Eight hundred yards distance was abundantly sufficient to enable them to check their speed and come at least to an entire stand-still before meeting. It is evident that either one, or both, did not perform that duty; they could not both have commenced stopping and backing at a distance of eight hundred yards from each other. This was their special duty under the circumstances. They both admit that no signal from the other was heard. To stop and back, and to commence to do this at eight hundred yards distance, was the specific duty of the moment. One, or both, certainly failed in performing this duty.

Two specific duties were incumbent upon the managers of the respective vessels: First, to signal at the required distance; and, second, on hearing no signal from the other, to commence stopping and backing at the required distance. Which of them neglected, or did both of them neglect, either of these duties? I have carefully looked over all the material evidence in the case, and have read the elaborate briefs of the counsel, and am forced to the conclusion that there was negligence on both sides. It is apparent from the case that both vessels, after having approached within a distance of eight hundred yards of each other, continued to make headway, and that the collision occurred at an intermediate point not far from that which was due to an equal amount of headway on both sides. In other words, so far as I can gather from the evidence, they met about midway of the distance which separated them when the first signal was given. The place of meeting was lower down than the place where the Potomac alleges that she gave her signal, and was higher up than the place where the Lee alleges that she gave her signal, and the relative movements of position of the vessels respectively seem to have been about the same. The evidence of negligence on the part of the Lee is quite clear. Leaving out the interested testimony of her officers, we have that of several passengers on board of her at the time, who all unite in saying that the captain was not on duty at the time, but was sitting in the social hall, engaged in conversation with the passengers, and that he never left the hall until the collision occurred, and that the Lee kept on her usual rate of speed; that no whistle was sounded; that the bells for reversing the

wheels were not rung until the moment preceding the collision, and several of them state that the pilot, before leaving the wharf boat at Natchez, had been drinking with his friends to a considerable extent, and although they seem to speak on that subject with reluctance, they say enough to give the distinct impression that he had taken enough liquor to be somewhat under its influence. Had the captain been at his post and on the lookout, there would have been a better chance of the Potomac's signal being heard on the Lee. On the other hand, laying aside the interested evidence of the officers of the Potomac, and looking to that of those who were free from any such bias, the weight of the evidence seems to be that she did not commence to stop and back until within a short distance of the point of collision—within, at least, the distance of four hundred yards of the Lee.

Mahlon Rush, one of the strikers on board the Potomac, states that he was in the Texas hall and heard the engine bells ring to stop her, and then the two short whistles of the Potomac; he then ran out on the hurricane roof, and as he went out he heard Captain Schunk halloo to the other boat, "stop that boat." He says, "The Lee was about one hundred and fifty yards from us when I heard our bells ring to stop, and she had got within a hundred yards of us before our engines stopped." He corrects this statement afterwards by saying that the boats were about three hundred yards apart, as near as he could judge, when he first went out on the roof. He afterwards says that "the two boats were three hundred yards apart when the engines were stopped, and about two hundred or two hundred and fifty when the starboard engine commenced backing;" and it is conceded that the larboard engine did not back at all. He says also that 'both boats were headed quartering towards the Mississippi shore, right after the collision. John Fink, a passenger on the Potomac, says, "I was sitting by the stove in the hall, engaged in conversation, and about a minute before the collision took place, I heard the Potomac's stopping bell ring; right after that her signal blew; right after that her backing bells rung, and that frightened me, I jumped up and started to the door forward, and I met the bar-keeper coming in at the door, and says he, 'follow me; for God's sake do not go there;' I ran back after him, and about two-thirds of the way towards the stern, when I felt and heard the jar of the collision between the two boats." It is evident from this testimony, and much more could be cited to the same effect, that the stopping and backing of the wheel, the giving of the signal by the whistle, and the collision, all followed one another in rapid succession, and that no sufficient interval of time between these successive events occurred to render it possible that the Potomac commenced the process of stopping and backing at a distance of eight hundred yards from the Lee, or anything like that distance.

I cannot review the evidence in detail. I can only say that after having carefully examined it, I am forced to the conclusion that there was some neglect, at least, on the part of the Potomac in reference to the duty of stopping and backing, and I am by no means satisfied that her signal was given by the whistle at the required distance from the approaching steamer. The rules and regulations adopted for the government of pilots of steamers navigating the rivers flowing into the Gulf of Mexico, are explicit on the subject of the precautions to be observed when steamers are about to meet and pass each other. (The justice here read the first and second rules, which require signals to be exchanged as soon as the vessels are within eight hundred yards of each other, indicating the side on which they will pass each other; and, if not exchanged and understood, requiring them to stop and back.) These directions are so plain and easy to be observed, that no vessel should be regarded as without fault which fails substantially to follow them. In my judgment there was such a failure on both sides in this case, which caused this disaster. I think there is stronger evidence of negligence on the part of the Lee than on the part of the Potomac. If I were permitted to gauge the demerit of the parties, I should be inclined to do so; but the law does not permit this to be done. If both parties are in fault, the damage is to be sustained by them equally. As to the actual damage which was allowed on the one side and on the other, having examined the master's report and the decree, I see no reason for disturbing the result to which the district court came.

A question is made with regard to the allowance of profits to a damaged steamer whilst undergoing repairs. It is well settled by the decisions of the supreme court, and by the general practice in admiralty in this country, that demurrage forms a fair subject for the allowance of damage in such cases. The Granite State, 3 Wall. [70 U. S.] 310; The Black Prince, Lush. 568. I think there is no error in the decree in this regard. The amount of damage allowed for the time the respective vessels were laid up, seems to have been reached in a proper manner. The average net earnings of the Lee for a certain period of time, embracing that of her detention for repairs caused by this collision, were taken as the basis of ascertaining the amount due to each trip, and the number of trips lost was a subject of very simple calculation. The value of the Potomac's time whilst she was laid up was based upon the evidence and declarations of those concerned in her, and was fixed at $100 a day. From the evidence before the master, I am disposed to think that the allowances were correctly made.

I have more difficulty with regard to a charge made against the Lee for the insurance money which she received from her underwriters. That is ordinarily a matter with which her adversary, in a case of collision, has nothing to do, and it seems to me a little hard on the owners of the Lee that they should not be permitted to apply their insurance to that portion of their damage for which they have no redress against the other vessel.

The result of the decree is to give to the owners of the Potomac the benefit of the insurance money belonging to the Lee, by deducting it from the moiety of the damage sustained by the Lee, for which the Potomac was made liable, instead of deducting it from, or allowing it to go upon, the other moiety for which the owners of the Lee have no recourse against any person. Had the owners of the Potomac refunded this amount to the underwriters upon the claim of the latter to be subrogated to the rights of the Lee against the Potomac, it might have been different, but as I understand the evidence, the underwriters made no claim against the owners of the Potomac, but voluntarily released all demands against them, and assigned to them any supposable rights they may have had. I am not satisfied that this transaction entitles the owners of the Potomac to have the amount of the insurance deducted from the moiety of the damage to the Lee, for which they were responsible. In my judgment, therefore, the decree should be corrected in that respect, and the owners of the Potomac should be made liable to pay one-half of the damage sustained by the Lee. without any such deduction. The decree will be drawn accordingly.

[NOTE. From the decree herein an appeal was taken by the claimants of the Potomac to the supreme court, where the circuit court decree was reversed, in so far as to deduct from the sum of $6,047.37, awarded to the libellant for one-half the excess of damages sustained by the Lee, the sum of $2,476.51, being one-third of the sums paid to him by the insurance companies, and in all other respects the decree was affirmed.

[The court held, in the opinion delivered by Mr. Justice Gray, that the Lee being engaged in, and peculiarly fitted out for, a particular business, the measure of allowance for the damages caused by her detention by reason of the repairs rendered necessary by the collision might be arrived at by averaging the net profits of her trips for the season, in the absence of any other satisfactory way of ascertaining her charter value, and that as the amount for which the Lee was insured was only two-thirds of her valuation, leaving the owner to stand his own insurer for the remaining third, and as the damages to be recovered were for the injury to his whole interest, and the insurer had no right to more than two-thirds of the damages recovered, the insurers, therefore, within the limit of their policy, were responsible to the assured for the entire damage to his vessel, and not merely for the moiety thereof, which, because of the fault on her part, as well as on the part of the other vessel, was all that he could recover against the latter, and the sum paid to him by the insurers was as equally applicable to the portion of the damages for which he could not recover against the other vessel as for that portion for which he could; consequently, only one-half of two-thirds, or one-third of the sum paid to libellant by the insurers, could be treated as paid on account of the damages, and that third only could be deducted from the damages. The Potomac v. Cannon, 105 U. S. 630.]